RENDERED:  MARCH 18, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1780-MR

MARK W. CARR                                               APPELLANT

APPEAL FROM TRIGG CIRCUIT COURT
v.          HONORABLE CLARENCE A. WOODALL, III, JUDGE
ACTION NO. 17-CI-00097

JESSICA J. CARR                                             APPELLEE

AND

NO. 2019-CA-1781-MR

JESSICA J. CARR                                        CROSS-APPELLANT

CROSS-APPEAL FROM TRIGG CIRCUIT COURT
v.          HONORABLE CLARENCE A. WOODALL, III, JUDGE
ACTION NO. 17-CI-00097

MARK W. CARR                                          CROSS-APPELLEE

OPINION
AFFIRMING IN PART,
VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE: COMBS, GOODWINE, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: This is a heavily litigated domestic relations matter involving the custody of a minor child. Mark W. Carr has appealed, and Jessica J. Carr has cross-appealed, from the Trigg Circuit Court's findings of fact, conclusions of law, and final custody order entered August 8, 2019, and from the October 9, 2019, orders ruling on their respective post-trial motions. Mark is seeking review of the parenting-time schedule pursuant to Kentucky Revised Statutes (KRS) 403.270(2), while Jessica seeks review of the award of joint custody. Having carefully considered the record and the applicable law, we affirm the joint custody award and vacate the portion of the custody order related to parenting time.

Jessica and Mark were married on October 23, 2010, in Marshall County, Kentucky. One child, a son, was born of the marriage in 2012. The parties separated on May 23, 2017, when Jessica and the then-four-year-old child moved out of the marital residence in Cadiz, Kentucky. She filed a petition to dissolve the marriage the same day. In the petition, Jessica sought the restoration of her non-marital property, a division of marital property and debts, sole custody

-2-

of the child, visitation for Mark, and child support. Mark responded to the petition, seeking its dismissal. He also sought temporary and permanent custody of the child, child support from Jessica, the assignment of his non-marital property, and a just allocation of marital property.

Mark filed a separate motion for temporary custody on June 7, 2017, under the newly enacted "shared parenting" legislation calling for a rebuttable presumption of temporary joint custody and equal parenting time in KRS 403.280(2). This new legislation, he said, would be effective at the time the hearing on his motion was to be held. Mark sought temporary joint custody and equal timesharing in alternating weeks, unless they agreed otherwise. In response, Jessica sought sole temporary custody of the child and argued that Mark should have visitation limited to one supervised, 24-hour period per week until a full custodial evaluation had been completed, based upon the recommendation of licensed clinical and forensic psychologist Dr. Sarah Shelton. Jessica based her motion upon concerns about the parenting dynamic between Mark and the child. The parties reached a temporary agreement as to timesharing until the temporary custody hearing was held.

On July 5, 2017, Jessica moved the court to compel Mark to execute a Health Insurance Portability and Accountability Act (HIPAA) release to allow their marriage counselor, licensed marriage and family therapist Jan Harvey, to

-3-

testify, and to permit her to depose Ms. Harvey and her individual therapist, Donald Harvey, Ph.D. Mark had objected to her taking Ms. Harvey's deposition, claiming his privilege pursuant to Kentucky Rules of Evidence (KRE) 506 and 507. She argued that the assertion of this privilege is not valid in custody cases where the mental state of the parties is at issue and constituted Mark's attempt to prevent the court from hearing credible evidence regarding his shortcomings in his ability to parent the child. In his response, Mark continued to assert the counselor-client privilege in KRE 506.

By order entered July 18, 2017, the circuit court determined that Mark's sessions with Ms. Harvey were for marriage counseling, rather than for therapy, and likened such sessions to settlement discussions, which are privileged pursuant to KRE 408. The court held that public policy favored protecting the privilege in situations involving marriage counseling. Therefore, the court denied Jessica's motion to compel. It ordered that Jessica could take Ms. Harvey's deposition, but any testimony must be limited to that involving Jessica on her waiver of privilege. In addition, the circuit court directed the parties to submit the names of two proposed custodial evaluators. Mark proposed David L. Feinberg, Ph.D., or Mary Fran Davis, licensed clinical social worker (LCSW), as his choices for custodial evaluators. Jessica proposed Dr. Shelton as the custodial evaluator.

Jessica and Mark were both cross-examined by deposition on July 14, 2017. Jessica testified that she thought Mark was irresponsible and did not always act in the child's best interests. He did not set a good example for the child by going in to work late, and he did not have any rules and was very permissive with the child. He was also unwilling to help out around the house, although she noted she was very conventional and traditional in what the roles of the man and woman were to be in a marriage and family. Jessica said she saw herself as the nurturer and that she was eager to quit her job to stay home with the child. She discussed the family sleeping situation and admitted that she would take the child from Mark's bed and bring him back to her bed. Other issues Jessica mentioned included that until the previous summer, Mark would have the child, who was three and one-half years old, sit in his lap exclusively during meals and spoon feed him, that Mark did not want her parents to keep the child, and that she did not get along with Mark's parents. She described his mother as overbearing, nosy, and intrusive. She believed Mark's parents undermined her authority with the child and were too permissive with him.

Jessica testified that, around December 2015 or January 2016, it became obvious the marriage was not working. She began marriage counseling but said the primary concerns involved parenting. She first had contact with Dr. Shelton in May 2017. Jessica and Dr. Shelton went over her concerns about the

parenting dynamic between Mark and the child, which included irresponsibility, no rules, being permissive, and his unhealthy attachment with the child. Jessica's philosophy as to parenting was that there should be a balance of love, warmth, and affection with rules, structure, and control. She said Mark went overboard with the television and allowed the child to treat her (Jessica) however he (the child) wanted to, including hitting her without Mark verbally reprimanding him. Jessica thought Mark had emotionally abused the child by insisting the child sleep in his bed, even when Mark was sick, and telling the child that Jessica's parents did not love him and would not come to visit. Jessica testified that she and the child were currently sharing a bed at her parents' house while they waited for their new home to be renovated. The child would have his own room in the new house.

In his deposition, Mark testified that many of the parenting issues arose from Jessica wanting to exclude Mark from the child's upbringing. Both Mark and Jessica testified about violence between them, with Jessica generally being the one to start physical violence, such as slapping and hitting.

The court held a temporary custody hearing on July 27, 2017. The court heard testimony from several witnesses, including Mark, Jessica, Mark's mother, and Mark's work supervisor. Jessica's concerns with Mark included lack of discipline, behavior issues, permissiveness, deviant behavior on Mark's part, and possible sexual abuse, although she had never reported any suspected abuse to

the Cabinet for Health and Family Services (the Cabinet) or filed a domestic violence petition on behalf of herself or the child. Jessica did report that domestic violence started on their honeymoon, when she slapped him after he called her an ugly name. She had slapped him again on more than one occasion, and he retaliated and hit her, including when she was pregnant.

Jessica testified that she was concerned with Mark's permissiveness and lack of discipline and structure when the child was with Mark and his parents. The child, she said, had to be "reprogrammed" after visitations (and earlier when the child had spent time with Mark and the grandparents over weekends prior to their separation while she was working). They would permit the child to watch PG-13 movies and eat whatever he wanted. The child would throw tantrums and be disrespectful to her and her parents for days after he returned. As to Mark's parenting ability, Jessica described what she considered to be Mark's unhealthy attachment to the child. She stated that Mark had encouraged nursing behaviors between him and the child well after breastfeeding had stopped, which she thought was odd and a form of sexual abuse; that the child would ask Mark to hold his penis when he was urinating long after he had been potty trained; that the child would sit on Mark's lap at dinner and he would spoon feed him when he was able to feed himself; and that Mark would tell the child that her parents loved his cousins more than him and were not coming to see him. She also testified that

Mark had a webcam and camera in the marital residences and had installed a dash cam in Jessica's car. She felt like she was being spied on during the marriage.

On August 14, 2017, the circuit court entered a temporary custody order. At that time, Jessica lived in Benton, Kentucky, with her parents, and was employed on a part-time basis as a physician's assistant in Paducah. Mark continued to live in Cadiz and was employed as a medical imaging systems administrator. The family had lived in both Kentucky and in Nashville, Tennessee, during the marriage. In the order, the circuit court made several findings related to how the parties describe themselves and their parenting styles:

> 14. [Jessica] describes herself as a "Type A personality" and it was clear from her testimony that she is the dominant partner in the marriage. She also believes she is clearly the better and more active parent because of her devotion to the child. She believes that [Mark] is too passive and that his parents are too "indulgent and permissive" with the child.
>
> 15. [Mark] admits that he is more "laid back" and rather than seek conflict, attempts to avoid conflict.
>
> . . . .
>
> 17. The Court believes that [Jessica's] philosophy for the child is correct: structure and stability are certainly in a child's best interests.
>
> 18. [Jessica] believes that [Mark] has no structure and no discipline and that his desire to be a "friend" with his son would not be good for the child if [Mark] were a joint custodian with equal time-sharing.

19. [Jessica] believes that [Mark] tries to undermine her authority in disciplining the child and gave examples[.] . . .

20. It is clear that both parents love their child and it is just as clear that they have diametrically opposed parenting styles.

The court went on to discuss the "disturbing allegations" Jessica made that involve the child's nursing or latching behavior with Mark, which Mark denied. The court also discussed the child's sleeping arrangements ("It was customary for the child to share the bedroom with the parties and when they lived in Cadiz, he slept in the same bed with both parties. In Nashville, the child did have a separate bed but generally slept with one of the parents in that bed, generally [Jessica.]") as well as the alleged bathroom behavior between Mark and the child.

The court considered the new presumption in KRS 403.280(2) and found it was in the best interest of the child for the parents to be joint custodians during the pendency of the action. It held that, "[d]espite the current inability of the parties to cooperate and despite their different personality and parenting styles, the Court believes that two intelligent, well-educated, and loving people can learn to communicate with each other for the best interests of the child they conceived together." However, the court found that it was in the child's best interests that Jessica be the primary residential parent, recognizing that the parents were in "high conflict mode." And "[w]ith [Jessica's] allegations in regard to inappropriate

behavior with the child," the court opted to take "a cautious approach" on parenting time to ensure the child's welfare. It also found that it would not be in the child's best interests to be in two separate preschools. Therefore, Mark's parenting time was to be as set out in the Visitation Guidelines of the 56th Judicial Circuit. The court ultimately denied Jessica's motion for temporary sole custody and granted Mark's motion for temporary joint custody.

By separate order, the court denied Jessica's designation of Dr. Shelton as a custodial evaluator, noting its concerns about her lack of independence as an evaluator as her only contact had been with Jessica. And by order entered September 13, 2017, the court appointed Dr. Feinberg as the custody evaluator in this case and ordered a custody evaluation.

Thereafter, the record reflects ongoing conflicts between Mark and Jessica as to Mark's ability to visit and communicate with the child, how the child should be raised, and sexual abuse allegations raised by Jessica. This began with Jessica's notice received on October 18, 2017, that she was denying visitation under KRS 403.240 based on her belief that the child would be endangered. By order entered October 23, 2017, the court ordered the parties to comply with the prior temporary custody and timesharing order. In addition, the court appointed a guardian *ad litem* (GAL) to represent the interests of the child in the litigation. During the course of the litigation, reports were filed in 2017 and 2018 with the

Cabinet regarding Mark's alleged sexual abuse against the child (bathing with bare hands and tongue kissing). The allegations were unsubstantiated, and the associated district court cases were later dismissed.

In addition, the record reflects disagreements as to what information could be used in the case and provided to others for review. Jessica moved the court for a protective order pursuant to Kentucky Rules of Civil Procedure (CR) 26.03 regarding evaluator Dr. Feinberg's request for information from Dr. Shelton and the Cabinet. She believed Mark's counsel had tainted Dr. Feinberg's independence by responding to an email from him rather than addressing it with her counsel. Jessica went on to address her concerns with Dr. Feinberg, including that Mark had designated him. The court ruled that Dr. Feinberg could not have access to the records or reports of either Dr. Shelton or Ms. Harvey as either Jessica or Mark had asserted their respective privilege.

Jessica filed a motion *in limine* to preclude Mark from introducing testimony from Cabinet social worker Alexia Pritchett or any of the evidence related to the Cabinet investigations she took part in, or to limit the evidence to testimonial only as to what she witnessed. Jessica claimed that Ms. Pritchett's actions and conduct during her investigations were against her. Jessica also filed a motion *in limine* to exclude the testimony of Dr. Feinberg because the probative value of his testimony on custody and visitation was outweighed by the prejudice

she would suffer under KRE 403 and because his testimony would not be based on sufficient facts under KRE 702. She based this motion on the financial relationship Dr. Feinberg had with the Cabinet as well as his interview with Ms. Pritchett during his evaluation without any indication she had engaged in unlawful conduct.

In November 2018, Mark moved the court for costs and fees pursuant to KRS 403.220 based upon Jessica's financial resources as well as her obstructive tactics and conduct that caused him to incur substantial attorney fees. He also filed a statement of issues to be addressed at the final hearing. These included precluding Jessica from relitigating the sexual abuse allegations as they had already been litigated at the district court level; that the court should award joint custody and award him no less than equal parenting time; that the court should appoint a parenting coordinator; and that Mark should be awarded child support due to Jessica's income.

Just prior to the trial date, Jessica moved the court for a continuance, citing difficulties obtaining certain records from the Cabinet related to Ms. Pritchett and Mark's failure to provide video and audio recordings he had made over the last year. Jessica stated that Mark had been recording every interaction between Mark, Jessica, and the child, which she believed was inappropriate and

harmful to the child. She continued to present concerns regarding Dr. Feinberg. Mark objected to the motion, which the court denied shortly thereafter.

The court held a bench trial on November 19 and 20, 2018, and February 7, 2019. Jessica testified first. She stated that the child was currently having significant tantrums and did not want to go to school, which was a drastic change in how he had been previously. He lacked interest in things that he enjoyed before. Paris Goodyear-Brown had been the child's therapist for a year on a weekly basis, and Jessica had been seeing Ms. Harvey as her personal counselor for two and a half years for marital turmoil and parenting concerns. She had not been doing well over the last year. She and Mark had been going to marital therapy from the late summer of 2016 through March 2017, when Mark quit attending counseling. Since the last hearing, Jessica testified that Mark had continued to record or at least hold up his phone around Jessica and the child. She thought this was harassment and caused distress to her and her family.

Jessica stated that she was not able to co-parent with Mark. Jessica hired a private investigator to follow Mark while he had the child with him. She found out Mark was spending most of his time with the child while at his parents' house. She believed Mark had a peer-to-peer relationship with the child rather than a parent-to-child relationship. While he did play with the child, Mark did not do anything responsible with him. The child's behavior issues began to worsen in

December 2017 after he spent a week with Mark. She did not believe the child felt safe at Mark's house because he did not exhibit bad behavior there. The child felt more comfortable with telling and showing her how he felt. His behaviors included tantrums, hitting, screaming, and biting her, her parents, and the dog. She believed it was hard for the child to go between two homes with differing parenting styles.

Jan Harvey testified next. She is a licensed marriage and family therapist in Tennessee. The Carrs were referred to her by her husband for marriage counseling in March or April 2016. She administered a Taylor-Johnson Temperament Analysis when she began to see them, and she testified about the scoring based on the answers given by Mark and Jessica. The court allowed her to testify as to the report because it was based on the data from the assessment. She described Mark's results as showing he was passive aggressive. She closed her file with Mark and continued her therapy with Jessica in April 2017 on a bi-weekly basis, during which they addressed Jessica's parenting as well as her anxiety around the custody situation. They had also discussed co-parenting. She believed Jessica would be willing to cooperate with whatever the court ordered. She described Jessica as a healthy person and an excellent mother. Her anxiety would dissipate as time went on.

On cross-examination, Ms. Harvey stated that she did not write down everything that was discussed during the sessions in her notes, but she did include the important information as to the counseling of the client. Jessica reported possible sexual abuse or inappropriate sexual behavior between Mark and the child in August 2017. She was not sure if this was the first time it was reported, but if it was the first time she recorded it, it probably was.

Dr. Michael Jenuwine testified next. He is clinical professor of law at the University of Notre Dame and a private practitioner at a forensic psychological practice. He performs custodial evaluations and reviews evaluations performed by others related to *Daubert*.[1] He reviewed Dr. Feinberg's custody evaluation and the records he reviewed, and he expressed concern about the reliability of some of the tests Dr. Feinberg used. He stated that Dr. Feinberg failed to address any boundary issues between Mark and the child.

Dr. Feinberg testified next. He is a licensed clinical psychologist who has been performing custodial evaluations for 35 years. At the time of the hearing, he had performed 500 evaluations. He found the child to be a normal little boy, more like Mark described him rather than as Jessica described him. He described Jessica as defensive, controlling, and possessive. He reported that no one had seen

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

anything that looked like sexual abuse and that the war between the parents was the child's biggest threat.  The child felt tremendous pressure and was acting out this pressure.  He recommended that both parents continue therapy and that a parenting coordinator be used.  Dr. Feinberg recommended that the court award joint custody.  If Jessica got sole custody, he believed that in a very short time Mark would have no visitation and never see the child again.  He believed the child needed more time with Mark.  He suspected the amount of pressure the child felt was echoed by his behavioral issues, including regressive nursing and bathroom behaviors.

Jessica moved to exclude Dr. Feinberg's testimony pursuant to *Daubert* based upon testimony from him and Dr. Jenuwine that the tests he used did not meet the appropriate standard.  Mark argued that only a few pieces of the overall custodial evaluation were at issue.  Dr. Feinberg explained that he was relying on other sources that were not subject to Jessica's *Daubert* motion.  The GAL cited to Dr. Feinberg's testimony that he did not rely on most of the testing.

The GAL introduced the testimony of Paris Goodyear-Brown that had been taken at a hearing on July 3, 2018, in the juvenile action (Case No. 18-J-00022-001).  Ms. Goodyear-Brown is a licensed clinical social worker with the Nurture House, a family treatment center in Franklin, Tennessee.  In this role, she began therapy with the child in the summer of 2017.  She discussed the bathing

-16-

and kissing allegations and different behaviors (sexual and psychosomatic) the child had been exhibiting over the course of their sessions. She believed the child was anxious over being put in the middle of the parents' divorce case. She noted there was deterioration in the child's behavior when he spent extended times away from Jessica.

The court entered several orders following the first two days of the trial. As to Jessica's *Daubert* challenge to Dr. Feinberg's testimony (based upon Dr. Jenuwine's testimony that Dr. Feinberg's evaluation did not meet relevant professional standards as it was too subjective), the court disagreed. It found that Dr. Feinberg was qualified as an expert based upon his knowledge, experience, and education, and that his methods were reliable.

In December 2018, Jessica filed a motion with the court related to Mark's continued use of his phone to video record or seem to video record the child when he was with her, in contravention of the court's bench order that he should not do so. Jessica stated Mark's actions were intentional and deliberately done in violation of the court's order to harass and taunt her and/or her parents. Although Mark denied that he had violated the court's rule, the court ordered him to show cause why he should not be held in contempt the morning of the third day of the trial. Jessica filed other similar motions in January related to Mark's actions at a doctor's appointment for the child and for holding an iPad on his vehicle's

dashboard pointed at her. Jessica believed Mark's actions were meant to provoke her and her family and were causing significant internal distress.

The custody hearing continued on February 7, 2019. Mark testified on direct examination. He opted to have all visitations with the child at his parents' house after his interview with Ms. Pritchett to prevent sexual abuse accusations. He did not see any tantrums, vomiting, bed wetting, or hitting, like Jessica reported. Mark had been working on adaptive coping skills, goals for personal growth outside of his role as a father, and on co-parenting skills through therapy with Dr. Sheehan and online classes. He stated that he would co-parent with Jessica. He thought the child needed both parents and that Jessica would continue to make decisions on her own and not include him in anything. He wanted to be the primary parent.

Cabinet Supervisor Sarah Andrus testified next, and through her testimony, Mark sought to introduce Ms. Pritchett's investigative reports as routine business records. Ms. Andrus was Ms. Pritchett's supervisor, and they consulted on the investigations. She stated that Ms. Pritchett was under subpoena to testify at the hearing but had the flu and would not be able to appear. Ms. Pritchett had previously testified by deposition; the court said it was up to Mark whether to introduce deposition testimony. Jessica objected to the introduction of the reports, stating that it was not the appropriate way to introduce what Ms. Pritchett did,

although she acknowledged that this was probably a routine business record exception. The court overruled the objection and permitted the reports to be admitted. The reports established that the complaints were unsubstantiated. Ms. Andrus stood by Ms. Pritchett's investigation and the results.

Jessica testified in rebuttal. She stated that the child was still not doing well and was having bathroom issues, crying, and vomiting. She did not agree that the fighting between her and Mark was causing stress for the child. She stated she would not compromise with Mark unless it was in the child's best interests. She had rules and structure at her house, unlike Mark. Due to her concerns, she wanted supervised visitation for Mark.

Following the third day of trial, the court entered an order of submission and summarized its bench rulings. The court had declined Mark's request that it interview the child as he had already been subjected to interviews in connection with the case, and it did not find that either party had intentionally or willfully violated its prior court orders and therefore did not hold either party in contempt. The court also ordered the parties to file briefs.

In her brief, Jessica requested that she be awarded sole custody of the child, stating that the child's condition had deteriorated over the course of the litigation and that he was experiencing heightened levels of anxiety. She also stated that she and Mark could not cooperate in parenting the child. As to

visitation, Jessica requested that the court adopt the recommendation of supervised visitation due to the risk of harm of sexual abuse based upon Mark's boundary issues with the child. She believed that Mark was the root cause of the child's problems and that Mark had done nothing to address these concerns.

In his brief, Mark requested that the parties be awarded joint custody, with him receiving the primary amount of parenting time and Jessica receiving parenting time pursuant to the court's Guidelines. He argued that the child's condition had worsened under Jessica's care as the primary custodian due to her alienating behaviors toward Mark and her own deteriorating mental and emotional health.

The GAL also filed a brief, recommending that the parties should be awarded joint custody and that a parenting coordinator be appointed. He recommended that the child should continue to live primarily with Jessica as she could provide full-time care for him; that Mark should have increased, unsupervised visitation; and that the child should remain in counseling.

In her reply brief, Jessica disputed Mark's assertions that she was mentally unfit and questioned Mark's emotional stability. She also pointed to Mark's alienating behaviors, including video recording Jessica and her family in the presence of the child.

On August 8, 2019, the circuit court entered its findings of fact, conclusions of law, and final custody order. After considering the factors set out in KRS 403.270(2), the court set forth its findings as to the relevant factors in paragraph 118 as follows:

> a. [Jessica] wants to be sole custodian and restrict [Mark's] visitation to supervised by a professional, non-family member. [Mark] is willing to continue to try to co-parent with [Jessica]. [Mark] thinks joint custody is in the best interests of the child with [Mark] being the Primary Residential Parent and [Jessica's] parenting time being as set out in the Visitation Guidelines of the 56th Judicial Circuit.
>
> b. The Court did not inquire about the child's wishes from the child because the child has been interviewed too often already.
>
> c. The child apparently has a good, close, loving relationship with both parents.
>
> d. The motivation of the parents – [Jessica's] main goal is to protect and control her child. However, her behaviors alienate the child from [Mark] and diminish his role in the child's life. She justifies that motivation based upon the multiple incidents of "sexualized behavior" she has noted. There is no credible evidence that any of it actually took place with [Mark]. [Mark] is partially motivated by the role the child plays in fulfilling [Mark's] life needs in a father-child relationship, but primarily the Court believes [Mark] is concerned about the best interests of the child.
>
> e. The child's adjustment and continuing proximity to home, school, and community. The child has apparently adjusted well to both homes and to the

Marshall County School and community. He has not developed much community awareness in Trigg County, but were [Mark] to be the Primary Residential Parent, the child is young enough going into the first grade where he could easily adjust. Fortunately, the two communities are less than an hour apart.

f. The mental and physical health of the parents – both parties are in generally good health. [Mark] admits being somewhat passive and depressed over the ongoing struggle over the child. [Jessica] has been diagnosed by Dr. Frankel with adjustment disorder with anxiety. She takes prescribed medicine for her mental health. She seems to be fixated on "rescuing" the child from [Mark] and controlling the child (and [Mark's]) behavior.

g. Domestic violence is not a factor in this case.

(h., i., j.) – De facto custodianship is not a factor in this case.

k. The likelihood that a party will allow the child frequent, meaningful, and continuing contact with the other parent – there is no believable evidence that continuing contact with either parent would endanger the child's health or safety. It is clear from [Jessica's] continuing pattern of conduct in regard to the child and [Mark's] relationship, that there is little likelihood that if she were the sole custodian the child would have frequent, meaningful, or continuing contact with [Mark].

Based on these factors, the court determined that joint custody was still in the child's best interest so that the parents would have an equal opportunity to raise their child. However, the court found that the presumption for equal parenting

-22-

time had been rebutted and designated Jessica as the primary residential parent. The court then set Mark's visitation in accordance with the 56th Judicial Circuit's Guidelines. It went on to order the parties to provide information regarding child support and denied Mark's motion for an award of costs and fees, stating that both parties had the ability to meet their own financial responsibilities.

Jessica moved the court to vacate its judgment and for a new trial pursuant to CR 59 or, in the alternative, for proceedings in lieu of a new trial pursuant to CR 59.07 to take additional testimony from Ms. Pritchett or to consider her deposition testimony. Jessica argued that the court improperly admitted the Cabinet reports carte blanche pursuant to the business record and public records and reports exceptions to the hearsay rule (KRE 803(6) and (8)). She stated she was entitled to a new trial under CR 61.02 due to manifest injustice based on the admission of these reports in lieu of Ms. Pritchett's testimony. Jessica filed a separate motion the same day pursuant to CR 52 and CR 59, arguing that the circuit court erroneously relied upon the opinions and conclusions of Dr. Feinberg as his methodology was not reliable and erroneously admitted Ms. Pritchett's Cabinet report over her hearsay objection. Jessica also sought additional findings of fact. She specifically asked that the award of joint custody be vacated, stating that it was not supported by sufficient evidence and that the evidence, instead, supported an award of sole custody to her.

Mark also filed a motion to alter, amend, or vacate the final custody order pursuant to CR 52.02, CR 59.01, CR. 59.05, and CR 59.07. As to the custody order, Mark disputed the circuit court's failure to award him equal or near-equal parenting time, despite the rebuttable presumption in KRS 403.270(2). Mark argued that the key factors the court considered, which were either neutral or in Mark's favor, did not support the court's conclusion that the presumption of equal parenting time was rebutted. Therefore, he requested the court to amend the final custody order to reflect a 50-50 parenting time or one that maximized the amount of time the child spent with each parent. Alternatively, he requested additional findings as to the specific reasons and facts that called for a deviation. Mark also disputed the court's denial of his motion for fees and costs.

The court heard arguments on the parties' post-trial motions on September 26, 2019. Mark argued that Jessica knew she could have moved to introduce Ms. Pritchett's deposition testimony but chose not to because it contained information she did not like. Mark said it was a discovery deposition not meant to be introduced. The GAL did not believe timesharing needed to be altered as there was enough evidence to overcome the presumption that equal timesharing was in the best interest of the child.

On October 9, 2019, the court entered orders ruling on the pending motions. As to Jessica's motions, the court upheld its decision as to Dr. Feinberg's

testimony and the admission of the Cabinet reports. The court made additional findings of fact related to the reports to the effect that it did not consider the opinions and conclusions in the Cabinet reports, but only the statements of facts that were observed. In addition, the court recognized that Mark apparently made some inconsistent statements, but it did not lead the court to believe that he was grooming the child for potential inappropriate sexual behaviors. As to Ms. Pritchett's testimony, the court agreed with Mark that it was Jessica's trial strategy not to move to introduce Ms. Pritchett's discovery deposition. It also found that Jessica's counsel was able to point out deficiencies in Ms. Pritchett's work through the cross-examination of her supervisor, Ms. Andrus. Additional testimony would not have been helpful to the court, as it did not rely on any of Ms. Pritchett's opinions. The court ultimately denied Jessica's motion.

As to Mark's motion, the court agreed with him that it had improvidently and prematurely denied his previous motions for an award of attorney fees and costs. The court vacated that portion of the findings of fact and indicated that it would defer ruling on this issue until it had sufficient testimony as to the financial circumstances of the parties. The court did not, however, change its ruling on the parenting time schedule, stating that there was sufficient evidence in the record to rebut the statutory presumption.

Mark appealed, and Jessica cross-appealed, from the circuit court's orders, which we shall now review. Mark seeks review of the circuit court's decision not to order equal timesharing between him and Jessica, while Jessica seeks review of the award of joint custody as opposed to an award of sole custody to her, along with several evidentiary issues.

Our standard of review is set forth in *Jones v. Jones*, 510 S.W.3d 845, 848-49 (Ky. App. 2017):

> When reviewing child custody cases, we engage in a two-step analysis. These two steps each have a different standard of review. First, the trial court's findings of fact are examined for clear error, and findings may be set aside when they lack substantial evidence to support them. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). If, after review, this Court determines the factual findings do not present clear error, the analysis shifts to an examination of the trial court's legal conclusions, looking for abuse of discretion using a *de novo* standard. *Heltsley v. Frogge*, 350 S.W.3d 807, 808 (Ky. App. 2011). Abuse of discretion occurs when a ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Both parties address the application of KRS 403.270(2), which was amended during the course of the action to create a rebuttable presumption that joint custody and equal parenting time is in the child's best interest (the applicable addition to the statutory language is italicized below):

> The court shall determine custody in accordance with the best interests of the child and equal consideration shall be

-26-

given to each parent and to any de facto custodian. *Subject to KRS 403.315, there shall be a presumption, rebuttable by a preponderance of evidence, that joint custody and equally shared parenting time is in the best interest of the child. If a deviation from equal parenting time is warranted, the court shall construct a parenting time schedule which maximizes the time each parent or de facto custodian has with the child and is consistent with ensuring the child's welfare.* The court shall consider all relevant factors including:

(a) The wishes of the child's parent or parents, and any de facto custodian, as to his or her custody;

(b) The wishes of the child as to his or her custodian, with due consideration given to the influence a parent or de facto custodian may have over the child's wishes;

(c) The interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests;

(d) The motivation of the adults participating in the custody proceeding;

(e) The child's adjustment and continuing proximity to his or her home, school, and community;

(f) The mental and physical health of all individuals involved;

(g) A finding by the court that domestic violence and abuse, as defined in KRS 403.720, has been committed by one (1) of the parties against a child of the parties or against another party. The court shall determine the extent to which the domestic violence and abuse has affected

the child and the child's relationship to each party, with due consideration given to efforts made by a party toward the completion of any domestic violence treatment, counseling, or program;

(h) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian;

(i) The intent of the parent or parents in placing the child with a de facto custodian;

(j) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school; and

(k) The likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent or de facto custodian, except that the court shall not consider this likelihood if there is a finding that the other parent or de facto custodian engaged in domestic violence and abuse, as defined in KRS 403.720, against the party or a child and that a continuing relationship with the other parent will endanger the health or safety of either that party or the child.

KRS 403.315, which became effective the same day as the 2018 amendment to

KRS 403.270, provides:

When determining or modifying a custody order pursuant to KRS 403.270, 403.280, 403.340, 403.740, the court shall consider the safety and well-being of the parties and of the children. If a domestic violence order is being or has been entered against a party by another party or on behalf of a child at issue in the custody hearing, the presumption that joint custody and equally shared parenting time is in the best interest of the child shall not apply as to the party against whom the domestic violence order is being or has been entered. The court shall weigh all factors set out in KRS 403.270 in determining the best interest of the child.

And KRS 403.320 provides, in relevant part:

(1) A parent not granted custody of the child and not awarded shared parenting time under the presumption specified in KRS 403.270(2), 403.280(2), or 403.340(5) is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral, or emotional health. Upon request of either party, the court shall issue orders which are specific as to the frequency, timing, duration, conditions, and method of scheduling visitation and which reflect the development age of the child.

(2) If domestic violence and abuse, as defined in KRS 403.720, has been alleged, the court shall, after a hearing, determine the visitation arrangement, if any, which would not endanger seriously the child's or the custodial parent's physical, mental, or emotional health.

We shall first address Jessica's arguments in her cross-appeal as to the propriety of the circuit court's decision to award joint custody rather than sole custody to her. Jessica asserts that the court abused its discretion in failing to

consider KRS 403.315 as to her and the child's safety and well-being before determining that the presumption for joint custody had not been rebutted. She also raises two evidentiary issues.

Jessica's first argument addresses whether the circuit court properly applied the statutes in determining that joint custody was appropriate. She specifically argues that the circuit court failed to consider her and the child's safety and well-being due to domestic violence. She goes on to state that Mark's conduct in recording videos of her with his phone constituted stalking behavior that met the definition of domestic violence and abuse under KRS 403.720(1). This behavior, she concludes, was not conducive to a joint custody arrangement between her and Mark. She also argues that the circuit court failed to consider the child's deterioration in assessing his safety and well-being.

We decline to consider this argument as Jessica did not make any type of domestic violence allegation below, nor did she seek a domestic violence order. And she did not include any statement about preservation in her briefs pursuant to CR 76.12(4)(c)(v) or specifically include this issue in her prehearing statement. CR 76.03(8) states that "[a] party shall be limited on appeal to issues in the prehearing statement except that when good cause is shown the appellate court may permit additional issues to be submitted upon timely motion." *See also Martin v. Pack's Inc.*, 358 S.W.3d 481, 487 (Ky. App. 2011) ("[The appellant] has

-30-

failed to cite where he preserved this argument by presenting the facts to the trial court. 'It is well-settled that a trial court must be given the opportunity to rule in order for an issue to be considered on appeal, and the failure of a litigant to bring [a matter] to the trial court's attention is fatal to that argument on appeal.' *Baker v. Weinberg*, 266 S.W.3d 827, 835 (Ky. App. 2008)."). We also note that the circuit court found that domestic violence was not a factor in this case, and Jessica did not seek review of this finding. Accordingly, we agree with Mark that Jessica did not preserve this issue for our review and decline to address it further.

Next, Jessica contends that the circuit court failed to correctly apply the decision in *Squires v. Squires*, 854 S.W.2d 765 (Ky. 1993), as to the effect on the child of their inability to co-parent. In *Squires*, the Supreme Court of Kentucky stated:

> The General Assembly has determined that [the concept of joint custody] is viable and it is our duty to apply the statutory framework in a manner which gives effect to legislative intent. *H.O. Hurley Co. v. Martin*, 267 Ky. 182, 101 S.W.2d 657 (1937). From the language used, we believe the General Assembly intended to inform courts of their option to award joint custody in a proper case without mandating its use in any case. Implicit in the authorization to award joint custody is that the court do so after becoming reasonably satisfied that for the child the positive aspects outweigh those which are negative. We see no significant difference between the analysis required with respect to joint custody than the analysis required when the court grants sole custody. In either case, the court must consider all relevant factors and formulate a result which is in the best interest of the

-31-

child whose custody is at issue. Legislative authorization of joint custody merely gives the trial court another alternative if such appears to be appropriate.

> The parties have debated the significance of parental agreement and willingness to cooperate at the time of the custody determination. While we have no doubt of the greater likelihood of successful joint custody when a cooperative spirit prevails, we do not regard it as a condition precedent. To so hold would permit a party who opposes joint custody to dictate the result by his or her own belligerence and would invite contemptuous conduct. Moreover, the underlying circumstance, the parties' divorce, is attended by conflict in virtually every case. To require goodwill between the parties prior to an award of joint custody would have the effect of virtually writing it out of the law.

*Id*. at 768-69. She also cites to *Gertler v. Gertler*, 303 S.W.3d 131, 135 (Ky. App.

2010), in which this Court stated:

> When determining an award of child custody, KRS 403.270(2) directs the circuit court to give equal consideration to both parents and to award custody in accordance with the best interests of the children involved. The statute further permits an award of joint custody if it is in the children's best interests. KRS 403.270(5). However, there is no statutory preference for an award of joint custody, an arrangement which entails joint decision-making and significant participation by both parents in the upbringing of their children. *Squires v. Squires*, 854 S.W.2d 765, 769 (Ky. 1993).

Unfortunately for Jessica, with the 2018 amendments to KRS

403.270, the General Assembly opted to include a statutory presumption of joint

custody, and Jessica's citations to the language in these cases to the contrary does

-32-

not support her argument. We agree with the circuit court that parental

cooperation is not a condition precedent for an award of joint custody and that the

circuit court did not abuse its discretion in determining that the presumption for

joint custody had not been rebutted in this case, especially as Jessica's own

conduct contributed to the strained co-parenting relationship between her and

Mark.

We shall next address Jessica's arguments related to the circuit court's

evidentiary rulings. We shall review these rulings for abuse of discretion:

> [The appellant's] argument is based upon the
> family court's decision to exclude evidence from trial,
> therefore, it is his burden on appeal to demonstrate: (1)
> the substance of the excluded evidence; (2) that the
> family court abused its discretion by excluding it; and (3)
> that there was a substantial possibility the court would
> have reached a different verdict if the evidence had not
> been excluded. *See* KRE 103;[2] *Goodyear Tire &
> Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)
> (explaining the standard to reviewing a trial court's
> ruling admitting or excluding evidence is abuse of

---

[2] In relevant part, KRE 103 provides:

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which
> admits or excludes evidence unless a substantial right of the party is affected;
> and
>
> . . .
>
> (2) Offer of proof. If the ruling is one excluding evidence, the
> substance of the evidence was made known to the court by
> offer or was apparent from the context within which questions
> were asked.

(Footnote 10 in original.)

-33-

discretion, and the test is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles); *see also Hart v. Commonwealth*, 116 S.W.3d 481, 483-84 (Ky. 2003).

*Lewis v. Fulkerson*, 555 S.W.3d 432, 439 (Ky. App. 2017).

Jessica first argues that the circuit court abused its discretion when, in conjunction with the temporary custody hearing, it excluded evidence of Mark's mental health treatment by Ms. Harvey pursuant to Mark's assertion of the KRE 506 privilege. KRE 506 states, in relevant part, as follows:

> (b) General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of counseling the client, between himself, his counselor, and persons present at the direction of the counselor, including members of the client's family.
>
> (c) Who may claim the privilege. The privilege may be claimed by the client, his guardian or conservator, or the personal representative of a deceased client. The person who was the counselor (or that person's employer) may claim the privilege in the absence of the client, but only on behalf of the client.
>
> (d) Exceptions. There is no privilege under this rule for any relevant communication:
>
>> (1) If the client is asserting his physical, mental, or emotional condition as an element of a claim or defense; or, after the client's death, in any proceeding in which any party relies upon the condition as an element of a claim or defense.

(2) If the judge finds:

>> (A) That the substance of the communication is relevant to an essential issue in the case;

>> (B) That there are no available alternate means to obtain the substantial equivalent of the communication; and

>> (C) That the need for the information outweighs the interest protected by the privilege. The court may receive evidence in camera to make findings under this rule.

The circuit court based its ruling to uphold Mark's privilege on its determination that Mark's sessions with Ms. Harvey were for marriage counseling, rather than for therapy, and it likened these sessions to settlement discussions, which are privileged pursuant to KRE 408. It also stated that public policy favored protecting the privilege in situations involving marriage counseling. On Jessica's motion, the court subsequently permitted Ms. Harvey to release the parties' personality testing and results for *in camera* review, which the court determined were not subject to Mark's claimed privilege and about which Ms. Harvey was permitted to testify at the custody hearing.

Jessica argues that a parent is not permitted to assert this privilege in a custody case where the mental state of the parties is at issue, citing KRS 403.340(3)(b),[3] *Bond v. Bond*, 887 S.W.2d 558, 560-61 (Ky. App. 1994), and *Atwood v. Atwood*, 550 S.W.2d 465 (Ky. 1976). However, we note that both of these cases address the application of the psychotherapist-patient privilege and arose from situations where a person was being treated by a psychiatrist for a mental or emotional illness, not joint counseling for marital issues.

Mark points out that the court left the door open for Jessica to revisit the ruling that communications made during marital counseling sessions including Mark were privileged. Jessica was then successful in obtaining the release of the personality testing for herself and Mark from Ms. Harvey. Jessica called Ms. Harvey as a witness at the final custody hearing, where she was permitted to testify about the personality testing as well as her therapy notes of Jessica's sessions with her beginning in April 2017. During this testimony, Ms. Harvey confirmed that the first discussion she had with Jessica concerning Mark's alleged sexual abuse did not occur until August 2017.

We agree with Mark that 1) Jessica was successful in obtaining the records she requested; 2) the earlier records including Mark would not have

---

[3] We presume Jessica meant to cite to KRS 403.340(4)(b), which concerns the mental and physical health of individuals in modification situations.

supported Jessica's claims that the sexual abuse allegations had been disclosed earlier due to Ms. Harvey's testimony that this had not been disclosed until much later; and 3) Jessica failed to place these earlier records in the record by avowal or seek reconsideration of the circuit court's initial ruling, thereby failing to properly preserve the issue for review. In addition, we agree with Mark that Jessica failed to show that the exceptions in KRE 506 applied in that she did not establish that the records she sought had anything to do with physical, emotional, or mental health conditions that would be relevant to the custody decision. Accordingly, we find no abuse of discretion in the circuit court's decision to uphold Mark's claim of confidentiality as to Ms. Harvey's records.

Next, Jessica argues that the circuit court abused its discretion in permitting the introduction of Ms. Pritchett's reports through her supervisor's testimony pursuant to KRE 803(6) and (8), the business records and public records and reports exceptions to the rule against hearsay. These sections exclude from the hearsay rules, even when a declarant is available:

> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness,

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

>   (A) Foundation exemptions. A custodian or other qualified witness, as required above, is unnecessary when the evidence offered under this provision consists of medical charts or records of a hospital that has elected to proceed under the provisions of KRS 422.300 to 422.330, business records which satisfy the requirements of KRE 902(11), or some other record which is subject to a statutory exemption from normal foundation requirements.

>   (B) Opinion. No evidence in the form of an opinion is admissible under this paragraph unless such opinion would be admissible under Article VII of these rules if the person whose opinion is recorded were to testify to the opinion directly.

. . . .

(8) Public records and reports. Unless the sources of information or other circumstances indicate lack of trustworthiness, records, reports, statements, or other data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by

law.  The following are not within this exception to the hearsay rule:

> (A) Investigative reports by police and other law enforcement personnel;
>
> (B) Investigative reports prepared by or for a government, a public office, or an agency when offered by it in a case in which it is a party; and
>
> (C) Factual findings offered by the government in criminal cases.

Jessica takes issue with the contents of Ms. Pritchett's investigative Cabinet reports that were introduced without her testimony, claiming that the information contained within them was unreliable and that the reports included double hearsay.  However, we agree with Mark that the circuit court properly permitted the introduction of these reports pursuant to KRE 803 through Ms. Pritchett's supervisor when Ms. Pritchett was unavailable to testify at the hearing due to sickness.  We note that the court did not rely on any opinions Ms. Pritchett expressed in these reports.

Although the court discussed the possibility of introducing Ms. Pritchett's deposition testimony at the trial, Jessica did not choose to do so.  CR 32.01 addresses the use of depositions and provides in relevant part:

> At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying,

may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

. . . .

(c) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds the witness: . . . (x) is prevented from attending the trial by illness, infirmity, or imprisonment[.]

We agree with the circuit court that Jessica's decision not to introduce the deposition was a matter of trial strategy and that it was too late to attempt to do so in a post-trial motion when she did not receive the result she wanted. In addition, Jessica had the opportunity to cross-examine Ms. Andrus during her testimony. Finally, Jessica failed to identify what statements in the reports constituted inadmissible opinion testimony or hearsay. Therefore, we find no error or abuse of discretion in the court's decision to permit the introduction of Ms. Pritchett's investigative reports under these circumstances.

Jessica listed an additional issue on page 26 of her brief; namely, whether the circuit court erred in allowing and considering the testimony of Dr. Feinberg. But as Mark points out, Jessica did not address this issue at all in the remainder of her briefs. Therefore, we shall not address this issue.

Accordingly, we find no error or abuse of discretion in the circuit court's decision to grant joint custody in this matter.

We shall now review the issue raised in Mark's direct appeal; namely, whether the circuit court failed to properly apply the presumption of joint custody with equal timesharing before applying the best interest standards in KRS 403.270(2) and in failing to apply these factors to maximize his parenting time with the child. As Mark pointed out, Jessica spent very little time addressing his direct appeal in her brief.

As stated earlier, the General Assembly amended KRS 403.270(2) during the course of this action to create a rebuttable presumption that joint custody and equal parenting time is in the child's best interest:

> The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent and to any de facto custodian. Subject to KRS 403.315, there shall be a presumption, rebuttable by a preponderance of evidence, that joint custody and equally shared parenting time is in the best interest of the child. If a deviation from equal parenting time is warranted, the court shall construct a parenting time schedule which maximizes the time each parent or de facto custodian has with the child and is consistent with ensuring the child's welfare. The court shall consider all relevant factors including [list omitted].

The issue Mark raises is one of statutory interpretation, which is a question of law that we review *de novo*. *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth, Transp. Cabinet*, 983 S.W.2d 488, 490 (Ky. 1998). The Supreme Court of Kentucky recently addressed the new presumption in KRS 403.270(2), noting as follows:

We first acknowledge that the equal timesharing presumption of KRS 403.270(2) is new to Kentucky and unique among the custody laws of other states, thereby limiting the precedent available to us. However, we believe that our canons of statutory construction, combined with our timesharing precedent, can resolve this issue. For example, we "must interpret the statute according to the plain meaning of the act and in accordance with the legislative intent."

*Layman v. Bohanon*, 599 S.W.3d 423, 430 (Ky. 2020) (citing *Floyd Cty. Bd. of Educ. v. Ratliff*, 955 S.W.2d 921, 925 (Ky. 1997)).

The crux of Mark's argument is that the circuit court failed to apply the statutory presumption that equal parenting time was in the child's best interest or craft a parenting time schedule that would maximize his time with the child. We agree with Mark.

In *Pittman v. Estelita*, No. 2019-CA-000333-ME, 2020 WL 2095903 (Ky. App. May 1, 2020), cited by Mark, this Court addressed the application of the amended version of KRS 403.270(2):[4]

While the family court's Order would easily pass muster under the prior version of KRS 403.270(2), the statute was amended effective July 14, 2018, a little over six months before the family court entered its Order. The new amendment altered the statutory framework for determining custody and timesharing insomuch as it created a rebuttable presumption that joint custody and

---

[4] CR 76.28(4)(c) provides that "[o]pinions that are not to be published shall not be cited or used as binding precedent in any other case in any court of this state; however, unpublished Kentucky appellate decisions, rendered after January 1, 2003, may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court."

equal timesharing is in a child's best interest. As amended, KRS 403.270(2) is clear, that the court *shall* begin with a presumption of joint custody and equal parenting time and in the event that deviation is warranted, the court *shall* create a schedule maximizing each party's time with the child.

Having carefully reviewed the order at issue, we cannot discern that the family court applied the presumption before embarking on its analysis of the individual best interest factors. Likewise, we cannot ascertain that the family court crafted its parenting time schedule so as to maximize each party's time with Child. It appears from the face of the order that the family court preemptively addressed the individual best interest factors listed in KRS 403.270(2)(a)-(k), before considering the presumption. Additionally, the family court did not state how the parenting time granted to either party would serve to maximize each party's time with Child, given the deviation from equal parenting time.

Because it is not apparent from the face of the order that the family court applied the new version of KRS 403.270(2), we must vacate and remand the family court's order as it relates to parenting time. On remand, the family court must begin its analysis with the rebuttable presumption that equal parenting time is in Child's best interest. Should the family court determine either party has presented sufficient evidence to overcome the presumption, it must expressly so state and provide supportive factual findings. It must craft a parenting time schedule designed to maximize Child's time with each parent consistent with ensuring Child's welfare.

*Pittman*, 2020 WL 2095903, at *5-6 (footnote omitted). *See also George v.*

*George*, No. 2020-CA-1057-MR, 2021 WL 4343434, at *4 (Ky. App. Sep. 24,

2021) ("On remand the circuit court must apply the presumption in favor of equal parenting time as set forth in KRS 403.270(2). After considering all the evidence in relation to the best interest factors, the circuit court should only deviate from the presumption if it concludes that equal parenting time is not in the children's best interests. It must then render written findings of fact to support its ultimate conclusions. While the findings need not be overly detailed, they must be sufficient for any later reviewing court to determine that the circuit court engaged in the proper analysis and to identify the evidence it relied upon in reaching its ultimate conclusions."); and *Nichols v. Nichols*, No. 2020-CA-0837-MR, 2021 WL 4343472, at *1 (Ky. App. Sep. 24, 2021) ("KRS 403.270(2) creates a rebuttable presumption in favor of equal timesharing. The circuit court's order does not contain any findings to explain why it chose to deviate from the presumption. As such, it does not comply with *Anderson v. Johnson*, 350 S.W.3d 453 (Ky. 2011), and *Keifer v. Keifer*, 354 S.W.3d 123 (Ky. 2011), which require written findings of fact in all matters affecting child custody and timesharing. Accordingly, we must vacate and remand the order as related to timesharing.").

As in the above cited cases, our review of the custody order establishes that the circuit court misapplied the amended version of the statute. Here, the circuit court first performed a best interests analysis before concluding that the presumption for equal parenting time had been rebutted. The court's

earlier analysis of these same best interest factors led it to conclude that the presumption of joint custody had not been rebutted. But the circuit court failed to point to what factors led it to reach the conclusion that the presumption of equal parenting time had been rebutted. Rather, it simply stated its conclusion that "the presumption for equal parenting time has been rebutted at this time." And in the order denying Mark's motion to alter, amend, or vacate, the court merely stated that "a reading of the existing Findings of Fact and the evidence in the record is sufficient to show that there is evidence of substance to rebut the statutory presumption of shared parenting time considering all relevant factors . . . including those set out in KRS 403.270(2)." This is insufficient as it provides nothing specific for this Court to review in order to determine whether the presumption of equal shared parenting time had been rebutted, and there is nothing in the record to suggest that the court designed a parenting schedule to maximize the child's time with Mark.

Accordingly, we must hold that the circuit court erred as a matter of law related to the issue of parenting time and vacate the order awarding Mark visitation pursuant to the Guidelines for visitation/time-sharing of the 56th Judicial Circuit. On remand, the court:

> must begin its analysis with the rebuttable presumption
> that equal parenting time is in Child's best interest.
> Should the family court determine either party has
> presented sufficient evidence to overcome the

presumption, it must expressly so state and provide supportive factual findings. It must craft a parenting time schedule designed to maximize Child's time with each parent consistent with ensuring Child's welfare.

*Pittman*, 2020 WL 2095903, at *6.

For the foregoing reasons, the portion of the final custody order of the Trigg Circuit Court as to parenting time is vacated, and this matter is remanded to the circuit court for further proceedings in accordance with this Opinion. The portion of the final custody order awarding joint custody is affirmed.

ALL CONCUR.

| BRIEFS FOR APPELLANT/CROSS-APPELLEE: | BRIEFS FOR APPELLEE/CROSS-APPELLANT: |
|---|---|
| James G. Adams III<br>Hopkinsville, Kentucky | James L. Deckard<br>Lexington, Kentucky |
| Julia T. Crenshaw<br>Hopkinsville, Kentucky | William F. McGee, Jr.<br>Smithland, Kentucky |
| | Thomas Banks II<br>Louisville, Kentucky |